J-S08001-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE MATTER OF: S.L.J.V., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M.J., MOTHER | |
| | No. 1373 MDA 2022 |

Appeal from the Order Entered August 25, 2022
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  30-AD-2022

| | |
|---|---|
| IN THE MATTER OF: C.R.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M.J., MOTHER | |
| | No. 1374 MDA 2022 |

Appeal from the Decree Entered August 25, 2022
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  29-AD-2022

| | |
|---|---|
| IN THE MATTER OF: J.E.H.J., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.M.J., MOTHER | |
| | No. 1375 MDA 2022 |

Appeal from the Decree Entered August 25, 2022
In the Court of Common Pleas of Dauphin County Orphans' Court at
No(s):  28-AD-2022

J-S08001-23

BEFORE:   OLSON, J., McCAFFERY, J., and COLINS, J.*

MEMORANDUM BY OLSON, J.                    **FILED:  MAY 19, 2023**

L.M.J., ("Mother"), appeals from the decrees entered August 25, 2022, that involuntarily terminated her parental rights to her dependent children, S.L.J.V., C.R.J., and J.E.H.J. (collectively, the "Children").   Mother's rights were terminated pursuant to the Adoption Act, 23 Pa.C.S.A § 2511(a)(1), (2), (5), (8), and (b). We affirm.

On March 31, 2022, the Dauphin County Social Services for Children and Youth filed petitions to involuntarily terminate Mother's parental rights to the Children.  Upon motion, the trial court appointed Jeffrey C. Clark, Esquire, to serve as guardian *ad litem* for the Children.[1]  On July 26, 2022, and August 25, 2022, the trial court held hearings on the termination petitions.  Mother was represented by counsel during each hearing.  Thereafter, on August 25,

---

* Retired Senior Judge assigned to the Superior Court.

[1] On April 7, 2022, for each of the Children, Attorney Clark filed motions to appoint guardian *ad litem* as counsel for purposes of involuntary termination of parental rights proceedings.  Motions to Appoint Guardian *ad Litem*, 4/7/22, at 1-2.  In each motion, Attorney Clark averred that he was "able to represent both the best interest[s] and legal interests of the [Children] in the involuntary termination of parental rights proceedings, as no conflict exists." **Id.** at 2. The trial court granted Attorney Clark's motion and appointed him as counsel for each of the Children during the involuntary termination of parental rights proceedings.  **See** Trial Court Orders, 4/11/22, at 1.  Upon doing so, we conclude that the trial court implicitly found that there was no conflict of interest with Attorney Clark serving as both guardian *ad litem* and the Children's legal counsel in accordance with **In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. Super. 2020).

- 2 -

2022, the trial court entered decrees terminating Mother's parental rights to the Children under Section 2511(a)(1), (2), (5), (8) and (b).[2]

On September 23, 2022, Mother, through new counsel, timely filed her notices of appeal from the trial court's decrees involuntarily terminating her parental rights, and her concise statement of errors complained of on appeal, pursuant to Pa.R.A.P.1925(a)(2)(i) and (b).[3]

Mother raises the following issue on appeal:

> Did the trial court abuse its discretion, or commit an error of law by determining it was in the [C]hildren's best interest to have Mother's parental rights terminated[?]

Mother's Brief at 7.

We review this appeal in accordance with the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 9 A.3d 1179,

---

[2] That same day, the trial court also entered separate decrees involuntarily terminating the parental rights of J.E.H.J.'s unknown father, and M.V., the father of S.L.J.V. and C.R.J. pursuant to 23 Pa.C.S.A § 2511(a)(1), (2), (4) and (b). *See* Trial Court Orders, 8/25/22, at 1. The decrees entered in the cases involving S.L.J.V. and C.R.J. indicate that the parental rights of these children's "unknown father" were terminated. However, there is no dispute the M.V. is the father of S.L.J.V. and C.R.J. and his rights were expressly terminated by the decrees entered on August 5, 2022. The fathers have not appealed the trial court's termination decrees and are not parties to this appeal.

[3] In accordance with the decision of our Supreme Court in *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), Mother filed three separate notices of appeal at each relevant trial court docket.

1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994).

*In re Adoption of S.P.,* 47 A.3d 817, 826–827 (Pa. 2012).

We have carefully reviewed the certified record, the submissions of the parties, the detailed opinion of the trial court, and the pertinent case law. Our review of the record demonstrates that there is sufficient, competent evidence in the record that supports the trial court's factual and legal determinations. Thus, we will not disturb the trial court's decision. *In re Adoption of S.P.*, 47 A.3d at 826-827. Accordingly, we affirm the trial court's decrees terminating Mother's parental rights to the Children pursuant to Section

2511(a)(1), (2), (5), (8), and (b) of the Adoption Act on the basis of the well-reasoned and thorough analysis set forth in Judge John J. McNally, III's December 12, 2022 opinion. **See** Trial Court Opinion, 12/12/22, at 1-33. In any future filing with this or any other court addressing this ruling, the filing party shall attach a copy of Judge McNally's December 12, 2022 opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 05/19/2023

IN THE MATTER OF : DAUPHIN COUNTY, PENNSYLVANIA

J.E.H.J. : No. 28 AD 2022- Orphans' Court Division
: No. CP-22-DP-104-2016 – Juvenile Court

A MINOR



**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

IN THE MATTER OF : DAUPHIN COUNTY, PENNSYLVANIA
:
C.R.J. : No. 29 AD 2022- Orphans' Court Division
: No. CP-22-DP- 4 -2020 – Juvenile Court
:
A MINOR :

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

IN THE MATTER OF : DAUPHIN COUNTY, PENNSYLVANIA
:
S.L.J.V. : No. 30 AD 2022- Orphans' Court Division
: No. CP-22-DP- 5 -2020 – Juvenile Court
:
A MINOR :

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**Appeal of L.M.J (Mother) Nos. 1373, 1374, 1375 MDA 2022 (Pa. Super.)**

~~December 12, 2022~~

## MEMORANDUM OPINION

Mother L.M.J., natural parent of three minor children, J.E.H.J., C.R.J. and S.L.J.V., appeals from separate Decrees issued by this Court on August 25, 2022, involuntarily terminating her parental rights to the Children and granting the petitions for a goal change to adoption. This Memorandum Opinion is offered in support of all Decrees entered, pursuant to Pa.R.A.P. 1925(a).

### Procedural Background

On March 31, 2022, Dauphin County Social Services for Children and Youth (Agency), filed petitions seeking the involuntary termination of Mother's parental rights. A goal change to adoption was requested through the Juvenile Court in each case. The Agency also filed petitions seeking the involuntary termination of the parental rights of Father M.V. as to the two younger children, C.R.J. and S.L.J.V., along with a goal change to adoption. Hearings were held before this

1

Court on July 26, 2022 and August 25, 2022. Mother was represented by counsel at each hearing. After the second hearing, this Court issued separate Decrees terminating Mother's parental rights as to all three Children, pursuant to Adoption Act Sections 2511(a)(1), (a)(2), (a)(5), (a)(8) and 2511(b). This Court also issued separate Decrees terminating Father's parental rights as to the two younger children. On September 26, 2022, Mother filed separate appeals to the Superior Court from each Decree terminating her rights.

The Children, J.E.H.J., C.R.J. and S.L.J.V., are currently ages seven, six and four, respectively. Mother is currently thirty years old and Father thirty-eight years old. They were all living as a family prior to January 8, 2020, when the Children were placed in the care and custody of the Agency. The Children were adjudicated dependent on January 15, 2020, following a hearing, and placed in the physical custody of their maternal grandmother. They were later removed from maternal grandmother's home after it was discovered she was living with a registered sex offender. The Children have since lived in two different foster homes, noted below.

### Petitions for Termination of Parental Rights - Allegations

As asserted in the petitions for termination of parental rights (TPR), the factual grounds for involuntary termination of Mother's parental rights were as follows: The Agency's first contact with the parents was on January 7, 2020, when the Agency received a referral that the family was residing at a motel and that Mother was allegedly abusing substances. Swatara Police took protective custody of the Children. A responding Agency caseworker requested a urine screen from Mother who refused, although she admitted to using methamphetamines recently. Mother was detained and charged that day with three misdemeanor counts of endangering the welfare of children and detained at Dauphin County Prison. She was released the next day after posting bail. The Children were placed in the physical custody of maternal grandmother. The Agency thereafter filed dependency petitions for each child and a shelter care hearing was held, following which the Children were placed in the temporary care and custody of the Agency.

On January 13, 2020, while the parents visited the Agency, a caseworker observed that Mother's face was cut, bruised and swollen, and that Father's hands and face were scratched.

2

The Agency took Mother to a local hospital and offered to take her to the YWCA Domestic Violence Shelter.

On January 15, 2020, following a hearing, the Children were adjudicated dependent and formally placed in maternal grandmother's physical custody (Third-Party Court Ordered Protective Supervision). The Juvenile Court adopted the Agency's proposed service objectives for the parents and issued additional orders requiring that each parent submit to a comprehensive psychological evaluation, with a parenting component, and follow through with recommendations, and that each parent complete a domestic violence program.

On February 6, 2020, Mother completed a drug and alcohol evaluation and was recommended for intensive outpatient therapy through T.W. Ponessa. On February 8, 2020, Justice Works' Short-Term Therapeutic Outreach to Prevent Placement (STOPP) opened services with Mother and listed the following services goals:

a. Apply for a PFA order against Father
b. Obtain housing at a domestic violence shelter through the HELP office
c. Assist Mother in attending drug screens on Monday, Wednesday and Friday
d. Assist Mother in attending supervised visitation with the children
e. Assist Mother in obtaining domestic violence services at the YWCA
f. Assist Mother in obtaining mental health services via Case Management Unit

On February 10, 2020, Harrisburg City Police officers located Mother sleeping on a bench and brought her to the Agency for assistance.

On February 18, 2020, Mother filed for a temporary PFA order against Father; however, after she failed to appear at the hearing, the case was dismissed. Mother claimed she could not attend because she had been looking for her wallet and forgot about the hearing.

On March 23, 2020, Mother informed the Agency caseworker that she and Father were planning on living in a tent in maternal grandmother's backyard. The Agency informed them this was not a viable option. Just two days prior to this interaction, Father had been detained and charged with unlawful possession of drug paraphernalia and his criminal docket remains pending.

3

On March 26, 2020, Mother and Father failed to participate in their scheduled psychological evaluations via telehealth and did not respond to the provider's attempts to contact them by telephone.

On April 5, 2020, Mother and Father appeared at maternal grandmother's residence around 11 p.m. and refused to leave her front porch until law enforcement responded.

On April 6, 2020, the Agency learned that Mother and Father were living under the Mulberry Street Bridge in Harrisburg and that Justice Works was taking food to them once a week. They later relocated to a church in Steelton, Pa.

On April 16, 2020, the first Permanency Review hearing was held before a Hearing Officer. The children were found to remain dependent and continue in the maternal grandmother's physical custody. The Juvenile Court found both parents in moderate compliance with their service plans. Mother attended the hearing, and would do so for all future Permanency Review hearings (including remotely).

Between May 11, 2020 to June 23, 2020, Mother and Father failed to participate in scheduled video visits with the Children. On June 18, 2020, Mother was unsuccessfully discharged from Justice Works STOPP due to her lack of progress and lack of contact. On June 25, 2020, the parents' re-scheduled psychological evaluations were cancelled due to their failure to confirm appointments.

Between August 13 and August 17, 2020, Mother was incarcerated at Dauphin County Prison due to a bench warrant and her bail was forfeited.

On September 10, 2020, following a second Permanency Review hearing, the Children were found to remain dependent and continue living with maternal grandmother. Mother was found to be in minimal compliance towards her service plan. Mother was ordered to participate in domestic violence counseling.

On September 10, 2020, Mother informed the Agency she was staying with her sister in Maryland and remained with her there until about October 1, 2020.

4

On October 1, 2020, Mother underwent a psychological evaluation through Hugh Smith & Associates with Dr. Hugh Smith. As asserted in the TPR petitions, Mother was diagnosed with PTSD, opioid use disorder, amphetamine-type substance use disorder and cannabis use disorder. Mother disclosed significant stressors and traumas throughout much of her life, including early childhood physical and sexual abuse, domestic violence in several adult relationships, a period of homelessness, traumatic brain injury, self-harm and long-standing substance use and relapse. Mother disclosed relapsing and using heroin and methamphetamines again at the time the Children were removed in January 2020. She also used marijuana to self-medicate.

Dr. Smith's evaluation noted that for the parenting constructs measured, Mother scored high risk in use of corporal punishment, medium/high risk in expectations of children and parent-child family roles, medium risk in parental empathy towards children's needs, and medium/low risk in children's power and independence. Dr. Smith recommended that Mother abide by all requirements set forth through the Agency; participate in individual, trauma-focused outpatient therapy; participate in intensive outpatient substance use treatment; participate in evidence-based parenting classes; receive a neuropsychological evaluation and follow-up medical care related to her head injury and headaches; receive assistance in securing housing and employment; and connect with supportive individuals and organizations.

On October 6, 2020, the Agency received a referral of suspected child abuse of the youngest child. A caseworker assessed the child who eventually told her that she was scared to go back to maternal grandmother's home because a household member had punched her. The caseworker visited the home that day and expressed concerns that maternal grandmother allowed the household member, Daniel Arndt, to reside with her without knowing his name. Maternal grandmother refused to allow the caseworker to conduct a home walkthrough. After law enforcement responded, the caseworker performed the walkthrough and noted concern with the conditions and cleanliness of the home. Based upon this incident, the Honorable John F. Cherry issued a verbal pick-up order for the Children that day. It was later determined that Arndt was a registered sex offender.

At the October 8, 2020 removal hearing, the Children were found to remain dependent and formally removed from maternal grandmother's custody. They were then placed in the physical custody of a foster family who informed the Agency that they could not be long-term resources.

As further alleged in the TPR petitions, on October 19, 2020, Mother visited the Agency for a meeting about the Children. She became agitated and paced the room, yelling and cursing at Agency staff, and flipping over a table. She stated that she was still living in Maryland but was visiting the Harrisburg area.

On October 26, 2020, Father contacted the Agency from a rehabilitation center. This was the last time the Agency had contact with him until later in 2022, and he purportedly moved to New Hampshire.

On October 29, 2020, the Agency tried, but was unable to obtain consent from Mother to authorize emergency surgery for the oldest child. As such, Judge Cherry issued the emergency verbal order for authorization.

On December 15, 2020, following a third Permanency Review hearing, the Children were found to remain dependent and in the Agency's care and custody and to remain in the physical custody of their foster parents. Mother was found in minimal compliance towards her service plan. Mother was further ordered to participate in a parenting program.

On December 15, 2020, the Agency learned that the YWCA Visitation Center had been unable to make contact with Mother to set up her orientation. The Agency had previously made a referral to the YWCA for Mother on November 13, 2020.

On January 19, 2021, Mother reported that she was been staying in an emergency shelter, but refused to report which one. She requested that her mail be sent to the Daily Bread in Harrisburg and the Agency sent her mail to that address for approximately one year.

On January 26, 2021, the Agency again tried unsuccessfully to obtain consent from Mother to authorize another emergency surgery for the oldest child, requiring the Juvenile Court to authorize the request.

On February 22, 2021, after Mother completed her intake at the YWCA Visitation Center, she became upset and reportedly screamed and threatened staff, which resulted in the YWCA closing her case and not accepting her for supervised visitation.

On April 5, 2021, Mother informed the Agency that she was employed at a Residence Inn as a housekeeper.

On April 12, 2021, following the fourth Permanency Review hearing, the Children were found to remain dependent. Mother was found to be in minimal compliance towards her service plan.

On April 29, 2021, Mother failed to provide consent for the Agency to authorize the youngest child to receive an early intervention evaluation and services related to the abuse she suffered living at maternal grandmother's home. The Juvenile Court was thus forced to provide authorization.

On July 12, 2021, Mother reported that she was still a housekeeper but would not disclose her current employer. She also indicated that she was currently renting a room, but refused to give her address to the Agency to assess it.

On July 13, 2021, following a fifth Permanency Review hearing, the Children were found to remain dependent. Mother was again found to be in minimal compliance with her service plan. Mother was ordered to provide negative urine screens in order for her to exercise any future supervised visitation with the Children. On July 22, 2021, during a supervised visit with the children at the Agency, Mother yelled and swore at Agency staff in the parking lot and then in the middle of the street, in the Children's presence.

On August 12, 2021, Mother pled guilty to three counts of endangering the welfare of children and was sentenced to three years of probation. These charges originated from the January 2020 incident, which brought the Children into the Agency's custody.

Sometime in August 2021, the Agency arranged for the Children to begin to visit with their second, prospective foster family. As noted, the first foster family was unable to be a long-term resource. On October 12, 2021, the Juvenile Court granted a request modifying the

7

Children's placement to the new foster home, after which the Children began to reside with foster mother J.Z. and foster father E.P.F.

On December 2, 2021, following the sixth Permanency Review hearing, this Court found that the Children remain dependent. The Court noted that Mother still showed minimal compliance towards her service plan. Mother's sister (maternal aunt) attended the hearing but noted that she was not a placement resource, although she indicated that she saw the Children on a weekly basis. She informed the Court that she and her family were looking for a larger residence that could be approved by an Interstate Compact for the Placement of Children (ICPC) home study in Maryland.

On December 2, 2021, Mother advised the Agency that she was working and residing at a Quality Inn in Harrisburg.

In January 2022, Mother advised the Agency that she had secured housing in Harrisburg. During a home assessment on January 10, 2022, the Agency caseworker noted that the home had little to no furniture although it had working utilities and food. On March 11, 2022, during a second home assessment, the caseworker noted that Mother had obtained furniture, although the home was disorganized. The caseworker was not able to complete a full walkthrough due to Mother becoming irate and acting erratically.

On March 16, 2022, following the seventh Permanency Review hearing, this Court found the Children were to remain dependent. Mother was found in minimal compliance with her service plan. The Court denied granting an exception to the Adoption and Safe Families Act timeframe.

At the March 16, 2022 hearing, Mother submitted documents showing she completed a Positive Parenting class on March 24, 2021, through Dauphin County's pre-trial services, although the Agency noted it was for a single class and was not a full evidence-based parenting program. Mother also submitted a sign-in sheet from mental health provider Riverside Associates, which reflected that she attended thirteen sessions between July 11, 2021 and March 10, 2022. It was noted at the hearing by the Agency and the Court that the documents did not include mental health records nor a treatment plan. Finally, Mother also presented a letter from Nasr Consultant Group showing that Mother had undergone a drug

8

and alcohol evaluation there on December 7, 2021, and was recommended for intensive outpatient treatment three times per week. The Agency requested that Mother provide her treatment records from Riverside Associates and Nasr to it, as neither organization would honor Mother's Agency releases.

On March 31, 2022, the Agency filed its TPR and goal change petitions against Mother and Father. (See J.E.H.J. TPR Petition pp. 2-12; C.R.J. / S.L.J.V. Petitions pp. 2-13)

### TPR Petitions – Compliance With Service Objectives

In the TPR and goal change petitions, the Agency recounted many areas of Mother's non-compliance with most of the Court-imposed initial service objectives and other requirements later imposed by the Juvenile Court over the course of this case, as follows:

*a. Mother will cooperate and comply with the Agency.*

Mother **has not** complied with this service objective.

*h. Mother will obtain and maintain safe, clean and stable housing for herself and her children.*

Mother **has not** complied with this service objective. Over the past two years, Mother has continued to struggle with homelessness and a lack of stable housing. She has been homeless, resided in shelters, resided with family member(s), resided in motels and rented a room.

On January 1, 2022, Mother obtained housing. The first assessment showed the home had food and working utilities but little furniture. A second assessment, while showing more furniture, revealed the home as disorganized and the caseworker could not complete a walkthrough due to Mother becoming irate. In addition, the Agency has no knowledge how Mother is paying for her housing since she has not provided proof of income to the Agency.

*c. Mother will not have any unsupervised contact with her children and will have appropriate interactions with her children.*

Mother has **partially complied** with this service objective as her contact with her children has been supervised. However, Mother has struggled on a number of occasions with having appropriate interactions in front of her children. On at least two occasions, Mother had to be redirected to not yell and scream in front of her children.

*d. Mother will participate in a drug and alcohol evaluation and follow all recommendations.*

Mother **has not** fully complied with this service objective. On February 6, 2020, Mother completed a drug and alcohol evaluation through Dauphin County Drug and Alcohol. She was recommended to participate in intensive outpatient therapy through T.W. Ponessa. In addition, on October 1, 2020, Mother completed a psychological evaluation with Dr. Hugh Smith. He recommended that she participate in intensive outpatient substance use treatment and specifically work towards relapse prevention and develop healthy coping strategies. On December 7, 2021, Mother reportedly received a second drug and alcohol evaluation through Nasr Consultant Group, Inc. and was recommended for intensive outpatient treatment.

Mother has not provided documentation reflecting her compliance with any of these recommendations (see also section (f) below).

*e. Mother will provide negative drug screens three times a week. In addition, per the 7/13/21 Order, Mother will provide negative urine screens prior to having a right to exercise supervised visitation.*

Mother **has not** complied with this service objective as she has provided inconsistent and positive urine screens.

Between January 15, 2020 to March 16, 2020, Mother submitted 15 of 26 possible screens: 5 were negative, 10 were positive with either amphetamines, marijuana, methamphetamines or a combination of substances, and 11 were presumptive positives. (Urine screens were suspended due to COVID-19 restrictions between March 16, 2020 to July 23, 2020.)

Between July 23, 2020 to December 29, 2021, Mother submitted 47 of 222 possible screens. Of these, 12 were negative, 35 were positive for marijuana, alcohol, methamphetamines, amphetamines, methadone, cocaine or a combination thereof, and 175 were presumptive positives.

Mother does not have a prescription for methadone or medical marijuana.

There have been occasions where the Agency has had to reschedule her current biweekly supervised visitation with the minor children at Child First due to a positive urine screen or her work schedule.

*f. Mother will complete a psychological evaluation with a parenting component and follow through with all recommendations.*

Mother **has not** complied with this service objective. She initially failed to participate in psychological evaluations scheduled for March 26, 2020 and June

25, 2020. On October 1, 2020, Mother did complete a psychological evaluation with Dr. Smith.

Mother **has not** followed through with any of the recommendations. To date, she has not been compliant with her service objectives. She has not provided any documentation that she is involved in individual, outpatient trauma-focused therapy, intensive outpatient drug and alcohol treatment or an evidence-based parenting program. Mother has not followed through with the recommended neuropsychological evaluation or follow-up medical care for her traumatic brain injury or headaches. Mother has consistently denied any need for Agency or providers assistance to obtain residence or employment. She has connected herself with Daily Bread and HELP Ministries for housing and community supports.

*g. Mother will participate in and complete an Agency approved parenting program and demonstrate appropriate parenting skills on a daily basis.*

Mother **has not** complied with this service objective. In addition to this being an initial service objective, on December 15, 2020, the Juvenile Court also ordered Mother to participate in a parenting program due to her October 1, 2020 psychological evaluation with Dr. Smith, which recommended that she participate in an evidence-based parenting program due to concerns regarding her risk scores in the parenting constructs. The Agency has not received any documentation from Mother that she is involved in an approved parenting program.

Due to Mother' inconsistent contact, ongoing housing instability and inconsistent or positive drug screens, Mother has not qualified for Pressley Ridge Intensive Family Services.

*h. Mother will attend to all of the children's medical, dental and educational appointments and demonstrate an understanding of needs or recommendations.*

Mother **has not** complied with this service objective as she has not maintained consistent contact with the Agency.

*i. Mother will participate in and complete an Agency-approved domestic violence therapy.*

Mother **has not** complied with this service objective. In addition to this being an initial service objective, on September 10, 2020 the Juvenile Court ordered Mother to participate in domestic violence counseling. The Agency has not received any documentation evidencing her involvement with such counseling.

*j. Mother will attend all Court hearings, Agency meetings and treatment plan meetings.*

11

Mother **has complied** with this service objective as she attended all Court hearings and a pre-Court meeting.

*k. Mother will sign all release of information forms requested by this Agency to ensure compliance in meeting her identified service objectives.*

Mother **has not** complied with this service objective. On three occasions, the Agency has filed motions for authorizations due to Mother being unavailable to sign consents or authorizations for the Children.

*l. Mother will notify the Agency within 24 hours of new residence or new contact information.*

Mother **has not** complied with this service objective throughout her many moves.

*m. Mother is expected to reimburse Dauphin County for child support.*

[This objective is not applicable as Mother's child support order has been dismissed]

(See J.E.H.J. TPR Petition pp. 12-16; C.R.J. and S.L.J.V. Petitions pp. 13-17)

As asserted in the TPR and goal change petitions, as of the date of the filings on March 31, 2022, the Children had been in the Agency's care for a period in excess of sixteen (16) months and were then residing in a home willing to provide permanency with their second foster family, with whom they had been residing since October 12, 2021. The Agency asserted that it believed a goal change to adoption and termination of parental rights would permit permanency planning for the Children, and that adoption and termination of parental rights would meet the developmental, physical, and emotional needs and welfare of the Children, pursuant to 42 Pa. C.S. §6351 and 23 Pa.C.S. § 2511(b). The Children's Guardian ad Litem, Jeffrey Clark, Esquire, indicated his agreement with the filing of TPR petitions and goal change to adoption.

A hearing was initially scheduled for May 4, 2022 but was continued, however, to allow the Agency to complete and submit Comprehensive Psychological Evaluation Bonding Assessments of Mother, the Children and the foster parents. The Bonding Assessments were completed by Psychologist Donna-Mae Fierras of Hugh Smith & Associates, on May 23 and 24, 2022, and later submitted to the Court. An Assessment was created for each Child with their Mother, as well as for each Child and their current foster parents, a total of six Bonding Assessments. (Exbts. 44-49)

12

This Court reviewed these Assessments and found the following notable excerpts: As between Mother and the oldest child J.E.H.J., Fierras reported

> ... When with his mother, [J.E.H.J.] presents as an overactive, under-controlled and impulsive child which is notably drastically different from how he presents in other environments such as when he is with his foster parents and when he is at school. With regards to [Mother], **test results and information gleaned through the clinical interview and observation reflected global attachment-related concerns**, as well as behavioral concerns. Overall, [J.E.H.J.'s] lack of approach and contact seeking, lack of contact maintenance and consistent display of resistance towards [Mother] is **evidence of significant attachment problems**. His avoidance and resistance indicate that [**Mother**] **continues to be a source of stress and or trauma for [J.E.H.J.] and exposure to his mother is likely re-traumatizing for [J.E.H.J.]. Overall, he does not experience [Mother] as a safe emotional or physical anchor from which he can safety explore his world.**
>
> ...
>
> ... it appears that [**J.E.H.J.] has an avoidant and resistant attachment to [Mother]. In light of this, it is felt that it would be harmful for him to be in [Mother's] presence unsupervised, to avoid re-traumatization and an increase in behavioral concerns.**

(Exbt. 44 at pp. 30-21) (emphasis added)

Regarding the Bonding Assessment between the foster parents and the oldest child, Fierras reported:

> In terms of his attachment profile based on the strange situation, [**J.E.H.J.] exhibited secure attachment with both [foster mother J.Z. and foster father E.P.F.].** ... There were no signs of resistance or avoidance of either parent. [J.E.H.J.] seemed to enjoy close proximity during play and did not exhibit aversive signs with either parent, despite reports of his former mistrust in close relationships with women. Collectively, these above mentioned behaviors and interactions are associated most with a secure attachment style.
>
> ...
>
> In terms of the origins of the secure attachment profile, several strengths were observed within the parenting unit. Within this unit, [the foster parents] were observed frequently co-parenting very fluidly without overt discussions on who will assume what role. ...
>
> ... [**J.E.H.J.] seems to experience both foster parents as a safe, emotional space based on consistent, reliable and attunement on the part of [the foster parents].**

...

> ... it appears that [J.E.H.J.] has a secure and positive attachment with his foster parents. In light of this, it is felt that it would be detrimental for him to be removed from this home, as this could contribute to attachment ruptures and later emotional and behavioral problems.

(Exbt. 45 at pp. 45-47) (emphasis added)

As between Mother and the middle child C.R.J., Fierras reported:

> In terms of her attachment profile based on the strange situation, [C.R.J.'s] behaviors align most with an insecure attachment with features of an avoidant attachment and an anxious/preoccupied attachment.... [C.R.J.] generally avoided contact with [Mother] for various reasons such as her mother's preoccupation with handling other stressors and managing the other children. [C.R.J.] also did not look to [Mother] to meet her needs. ...

> Regarding the anxious/preoccupied features of [C.R.J.'s] attachment, it is critical to note that contact-seeking and contact maintenance generally occurred when [C.R.J.] perceived that [Mother] needed support, or when [Mother] initiated contact. [C.R.J.] seemed to meet her mother's socio-emotional needs, indicating blurred parent-child boundaries. ...

> In terms of the origins of the anxious aspects of [C.R.J.'s] attachment, per research, these features have been linked to inconsistent parenting marked by caregivers who are unpredictable, even with their affections, sometimes overly involved and other times withdrawn. This fluctuation in [Mother's] emotional availability has shaped anxiety about the parent-child dyad, which may have harmful effects on other intimate relationships such as [C.R.J.'s] relationship with her foster parents despite the stable and consistent care provided. ... Essentially, [C.R.J.] has learned that [Mother] is ineffectual in meeting her physical and emotional needs and she either meets her needs independently or by other means.

...

> Diagnostically, [C.R.J.] presents with symptoms consistent with Post Traumatic Stress Disorder. She experiences intrusive symptoms including nightmares of her biological mother and possibly her biological father. ...

> Regarding interventions, as noted the present bonding assessment reflected an overall insecure attachment and related behavioral issues. ...

> It is recommended that though [C.R.J.] is not resistant and actively avoidant of her biological mother, that contact with [Mother] be supervised. [Mother's] emotional co-dependence on [C.R.J.] bears negative effects on her emotional

14

and behavioral functioning in interpersonal contexts, especially in close, intimate relationships. **Further, [Mother's] attention was fleeting and unpredictable which not only perpetuates attachment difficulties but raises concerns of inadequate supervision of [C.R.J.].**

(Exbt. 46 at pp. 61-64) (emphasis added)

In her Bonding Assessment between the foster parents and C.R.J., Fierras reported:

**In terms of the origins of the secure aspects of [C.R.J.'s] attachment profile, several strengths were observed within the parenting unit.** Within this unit, [the foster parents] were observed frequently co-parenting fluidly without overt discussions on role assumption. ... Other strengths included having scheduled times to eat, sensitivity to sibling rivalry and fostering problem solving and decision-making skills in [C.R.J.].

**Regarding the origins of the insecure aspects of [C.R.J.'s] attachment, her history of deficient and pathogenic care in the first four years of life led to an implicit understanding that her mother was ineffectual in meeting her basic physical and psychological needs. [C.R.J.] hereby developed strategies to meet her own needs.** This explains her excessive clinginess geared to ensuring someone is present to meet her needs, as well as her constant testing behaviors to see if [foster mother] was still going to meet her needs for consistent care, attention, and affection.

**... Overall, [C.R.J.'s] history of developmental trauma has likely contributed to not only her insecure attachment, but her emotional and behavioral difficulties.** Per research, children who have endured such adverse childhood experiences internalize rage, anger, helplessness and sometimes hopelessness. This explains her aggressive outbursts and per results, the depression and anxiety. ...

(Exbt. 47 at pp. 79-81) (emphasis added)

As between Mother and the youngest child S.L.J.V., Fierras reported:

**... [S.L.J.V.] primarily displayed behaviors consistent with an insecure avoidant attachment.** Though she did not actively avoid or resist [Mother], she presented as neutral and at times even ignored her departure and return during the Strange Situation modification. [S.L.J.V.] demonstrated low separation anxiety and low distress upon reunification. Overall, she exhibited little emotional variation during these transitions which given her age may be atypical. ...

**Regarding the origins of the insecure aspects of [S.L.J.V.'s] attachment, per research these features have been linked to inconsistent parenting marked by**

15

caregivers who are unpredictable with their affections, sometimes overly involved and other times withdrawn. The fluctuation in [Mother's] emotional availability has shaped a general neutrality towards her mother where [S.L.J.V.] remains in the periphery, observes, and is independent when she needs to be. She also generally does not acknowledge [Mother's] absence or presence and does not compete for [Mother's] attention. ...

... As noted, her behaviors ... align most with an insecure avoidant attachment where she is primarily neutral towards [Mother] and unaffected by the level of attention, affection, and proximity provided. ... This orientation is likely related to [Mother's] lack of consistency with meeting [S.L.J.V.'s] physical and emotional needs and fleeting emotional availability. ...

Overall, [S.L.J.V.'s] history of developmental trauma has likely contributed not only to her insecure attachment, but her emotional and behavioral difficulties. ... The developmental trauma is also a possible explanation for the physiological issues that [S.L.J.V.] experiences such as enuresis and regression where she now consistently wears pull-ups.

Diagnostically, [S.L.J.V.] presents with symptoms consistent with Posttraumatic Stress Disorder. She experiences intrusive symptoms including nightmares of her biological mother and likely exhibits some re-enacting behaviors such as aggressive outbursts which are reflective of her exposure to severe domestic violence, the outbursts of her siblings, and arousal when she perceives she is not safe. She also exhibits regressive behavior, including the abovementioned enuresis, which will also be included diagnostically. ...

It is recommended that though [S.L.J.V.] is not resistant and actively avoidant of [Mother] that contact with her mother be supervised. [Mother's] attention was fleeting and unpredictable, which not only perpetuates attachment difficulties but raises concerns of inadequate supervision of [S.L.J.V.].

(Exbt. 48 at pp. 94-96) (emphasis added)

Finally, regarding the Bonding Assessment between the foster parents and the youngest child S.L.J.V., Fierras reported:

In terms of [S.L.J.V.'s] attachment profile based on the strange situation, though she exhibited behaviors that may be classified as secure attachment behavior such as expressed affection towards [foster mother], seeking help when needs arose, not withdrawing when help was provided, mutual gaze and initiating proximity, there are some features of insecure avoidant attachment as well. Though [S.L.J.V.] does not actively avoid or resist her caregivers, she presented as neutral or at times even ignored their departure or return during the Strange Situation modification. She exhibited little emotional variation during these

16

transitions, which given her age may be atypical. Notably, [foster mother] proactively reassured her that she would return, which could have been a buffer neutralizing [S.L.J.V.'s] emotional reaction, as well as the presence of her siblings. The likely need to develop independence from a very early age when living with her biological mother may be another factor neutralizing her emotional reactions during these transitions. ...

**In terms of the origins of the secure aspects of [S.L.J.V.'s] attachment profile, several strengths were observed within the parenting unit.** Within this unit, [the foster parents] were observed frequently co-parenting fluidly without overt discussions on roles. ... **Attunement to the children's needs [by the foster parents] was also consistently observed.** ... Other strengths included having scheduled times to eat, sensitivity to sibling rivalry and fostering problem solving and decision-making skills in [S.L.J.V.].

**Regarding the origins of the insecure aspects of [S.L.J.V.'s] attachment, her history of deficient and pathogenic care in the first two years of life led to an implicit understanding that her biological mother was ineffectual in meeting her basic physical and psychological needs.** [S.L.J.V.] thereby developed strategies to meet her own needs. ...

... it appears that though [S.L.J.V.] displays numerous features of a secure attachment with her foster parents, there are indicators of an insecure avoidant attachment at times, **which likely represent remnants of her early adverse experiences when living with her biological mother.**

(Exbt. 49 at pp. 109-112) (emphasis added)

Following submission of the Bonding Assessments, this Court held a hearing on July 26, 2022. A second hearing was held August 25, 2022.

### TPR and Goal Change Hearing

At the hearings, this Court heard the following relevant evidence:

The Agency's Creslyn Vandyck testified that she was Mother's first caseworker, between September 2020 and September 2021. She made referrals for Mother to meet her court-ordered service objectives and visited the Children once per month at their foster home and helped provide them with services. (N.T. 7/26/22 at 23) Based upon her review of Agency records and history, she noted that Mother and the Children first became involved with the Agency on January 7, 2020. On that day, police discovered the family in a filthy Rodeway Inn room and took protective custody

17

of the Children. The police found the door open (in the winter), and the room strewn with clutter, bags, crumbs, dirty clothing, drug paraphernalia and no bedding, as reflected in photos produced at the hearing. (N.T. 7/26/22 at 24-25, 27-28; Exbt. 37) Mother admitted using methamphetamines and police arrested her and later charged her with three counts of endangering the welfare of children. (N.T. 7/26/22 at 29)

After the Children were adjudicated dependent, they were placed with maternal grandmother. Caseworker Vandyck thereafter offered detailed testimony concerning the service objectives imposed upon Mother (see Exbt. 13), which testimony is substantively reflected above in great detail in this Memorandum Opinion, at pages 9-12 herein, and the Court refers the appellate court to that discussion as an accurate depiction of Vandyck's testimony concerning Mother's overall lack non-compliance or minimal compliance with almost every service objective including: failing to cooperate with the Agency, failing with timely undertake mental health evaluations and follow through with recommended treatment, failing to obtain stable housing including being homeless for substantial periods of time, failing to obtain domestic violence therapy, failing to follow through with drug and alcohol assessment recommendations including for intensive outpatient treatment, failing to undergo drug screens as recommended (completing only 52 of 210 scheduled) and providing numerous positive drug screens for those completed, failing to be available to authorize consents on numerous occasions including for the oldest child's surgery, and failing to maintain and/or provide proof of employment. (See N.T. 7/26/22 at 30, 32-43, 45-46, 52-56)

Vandyck also testified as to problems Mother had during visitations. After in person visits resumed in 2020, Vandyck reported that she escorted Mother to visits with the Children at a park in November 2020 that went well. As a result, Mother was referred for visitation through the YWCA. After some difficulty contacting Mother, she eventually attended orientation in February 2021 but cursed and screamed at YWCA staff so it refused to conduct visitations. (N.T. 7/26/22 at 44) Mother continued to visit with the Children remotely at their foster home through the Summer of 2021 during which Mother resumed a few in person visits. During one in July 2021, after the visit was over, Mother refused leave and told the Children they would be soon coming home with her. She stood in the middle of the street screaming and yelling, causing distress to the Children.

(N.T. 7/26/22 at 45) Vandyck also recalled another interaction with Mother alone where Mother got angry at her and charged her over drug screen results. On another occasion, Mother flipped over a table while meeting Vandyck and a supervisor. (N.T. 7/26/22 at 45-46)

Agency caseworker Kristen McCarthy, who succeeded Vandyck, testified that she was assigned to be Mother's caseworker in September 2021. (N.T. 8/25/22 at 67) McCarthy similarly offered testimony about Mother's overall non-compliance and minimal compliance with almost all Court-imposed objectives. (See N.T. 8/25/22 at 69-87, 92, 94, 102-103) Her testimony at the hearing is also largely reflected above in great detail in this Memorandum Opinion, at pages 9-12 herein, and the Court refers the appellate court to that discussion as an accurate depiction of McCarthy's testimony concerning Mother's compliance levels.

McCarthy offered the following additional testimony and clarifications: Regarding the objective that Mother undergo mental health treatment, McCarthy noted that Mother had provided no evidence of any intensive outpatient or trauma-based therapy. (N.T. 8/25/22 at 69-70) Mother did produce Riverside's sign in sheet to show she had undergone mental health treatment there and told McCarthy that Riverside provided her with group and individual therapy once or twice per week. (N.T. 8/25/22 at 68-70, 97) As noted, Mother was recommended initially for intensive outpatient treatment, which would be three times per week; however, the sign in sheet showed only that between July 2021 and March 2022, Mother attended just thirteen (13) sessions total out of the approximately seventy-five (75) to eighty (80) sessions that would be scheduled during that period of time. (N.T. 8/25/22 at 104) McCarthy considered Mother's mental health objective incomplete. (N.T. 8/25/22 at 71)

Regarding drug and alcohol treatment, Mother had been directed to undergo intensive treatment following a February 2020 evaluation, which treatment Dr. Smith also recommended in October 2020. (N.T. 8/25/22 at 71-72) Mother underwent a second evaluation by Nasr in December 2021, and it also recommended intensive outpatient treatment on a three-times per week basis. Nasr notified the Agency, however, via a therapist, that in July 2022 it changed its recommendation to a ninety-day, inpatient rehab. Nasr indicated that it revised its recommendation due to Mother's habitual synthetic marijuana use. (N.T. 8/25/22 at 73) Nasr obtained a bed for Mother at an inpatient facility but she failed to show up and Nasr discontinued services with her.

19

(N.T. 8/25/22 at 72-74) McCarthy thus considered Mother as not compliant with the drug and alcohol objective. (N.T. 8/25/22 at 77)

With regard to Mother's housing, when McCarthy took over the case, Mother had unstable housing and was living in motels. (N.T. 8/25/22 at 92) In January 2022, Mother obtained new housing and McCarthy visited Mother there through March of 2022, when the TPR petitions were filed, after which time Mother became irate at the Agency and the visits ceased. (N.T. 8/25/22 at 77-78, 92) Mother's new residence was a rental home leased solely to Mother and she claimed she lived there alone. (N.T. 8/25/22 at 78) However, McCarthy learned from probation officer Rolshausen and other persons and caseworkers who provided services to Mother and visited her home, that there were a lot of people who constantly came in and out of the home. (N.T. 8/25/22 at 79, 92) McCarthy confirmed that piles of personal items in the home looked to her as if more than one person was living there. (N.T. 8/25/22 at 98) McCarthy also learned that Mother worked inconsistently as a night-shift factory worker and housekeeper with the Crowne Plaza. (N.T. 8/25/22 at 80, 99) McCarthy later learned that as of August 2022, Mother was not employed. (N.T. 8/25/22 at 81)

With regard to visitation, McCarthy testified that beginning in September 2021, Mother and the Children conducted visitations at the Agency once per week. They later changed visitations to Child First, commencing in November of 2021, which occurred every other week for about two hours. (N.T. 8/25/22 at 83; Exbts. 28-29) Child First noted concerns with Mother's visits including tardiness, failure to bring a meals for the Children as directed, and inability to regulate the Children's behavior. (N.T. 8/25/22 at 83) During this time, Mother also had virtual visits with the Children. McCarthy testified that following virtual visits, the foster parents reported that the Children would have nightmares and exhibit poor behavior. (N.T. 8/25/22 at 84-85) According to McCarthy, after the TPR petitions were filed and the Children's visits with Mother suspended, the Children did not inquire about Mother and showed no behavioral issues. (N.T. 8/25/22 at 85-86)

As to the objective that Mother complete an evidence-based parenting program, McCarthy testified that the initial plan was for Mother to participate in Pressley Ridge's program. (N.T. 8/25/22 at 86) However, Pressley Ridge would not take the Agency's referral because Mother was actively using drugs and lacked stable housing, requirements for their program. (N.T. 8/25/22 at 86-87) McCarthy was aware that Mother had completed a parenting class with Alternative

20

Behavior Consultants (ABC); however, she noted that this class was not considered an evidence-based program and that Mother had been specifically advised by the Juvenile Court at an earlier Permanency Review hearing that the ABC program would not be considered as compliant with the objective. (N.T. 8/25/22 at 103-104)

Finally, McCarthy testified that the Agency attempted to find other family placement resources, including with the maternal aunt and uncle in Maryland, but that they were unable to find appropriate housing and no one else could commit to be as a resource. (N.T. 8/25/22 at 90-92) McCarthy stated that the Children still maintain virtual contact with maternal aunt and uncle. (N.T. 8/25/22 at 86)

Psychologist Fierras testified about her Bonding Assessments and as an expert on attachment and bonding. (N.T. 8/25/22 at 5-8) She offered testimony consistent with the Bonding Assessments excerpted above, including that the oldest child J.E.H.J. had a secure attachment with his foster parents. (N.T. 8/25/22 at 16-17, 28-29) With regard to C.R.J. and S.L.J.V., Fierras found they both exhibited aspects of secure and insecure attachment with their foster parents. (N.T. 8/25/22 at 17-18) Fierras explained that she believed their attachment or bond would improve and grow, however, the longer they remained with their foster parents, noting that they had only been living with them for seven months when she conducted her evaluations. (N.T. 8/25/22 at 18-19) Fierras opined that there would be injury to the Children if their bond with the foster parents were severed. (N.T. 8/25/22 at 31)

With regard to Mother and the Children, Fierras opined that given the current attachment levels, that if the Children's bond or relationship with her were severed, there would be no significant emotional injury to the Children. (N.T. 8/25/22 at 23) Specifically, she agreed that J.E.H.J. had an insecure attachment with Mother (reflected in the excerpts above). (N.T. 8/25/22 at 19-20) As for C.R.J., she exhibited features of avoidance attachment and anxious preoccupied attachment with her Mother, the latter of which Fierras stated stemmed from a history of unpredictability and instability with Mother. (N.T. 8/25/22 at 20) With regard to the youngest child S.L.J.V., Fierras testified that she primarily displayed behaviors consistent with an insecure avoidance attachment although she also displayed some secure attachment behaviors with Mother. (N.T. 8/25/22 at 21) Fierras agreed that all of the deficient attachments she found to exist between

21

Mother and the Children stemmed from former traumas they suffered while in her care. (N.T. 8/25/22 at 30)

Dr. Hugh Smith, the psychologist who performed a comprehensive psychological evaluation and parenting assessment on Mother, also testified. (Exbt. 25) As noted above, he diagnosed Mother with post-traumatic stress disorder and several substance use-related diagnoses including opioid use disorder (moderate, early remission), amphetamine-type substance use disorder (early remission) and cannabis use disorder (mild). (N.T. 8/25/22 at 55) He also assigned her psychological stressors including children in welfare custody as well as her personal history of spousal partner violence and childhood physical and sexual abuse. (N.T. 8/25/22 at 55)

Given his assessment, Dr. Smith offered the following recommendations for Mother in his October 1, 2020 report: (1) abide by all Agency requirements; (2) that due to considerable symptoms of trauma, Mother should participate in individual outpatient trauma-focused therapy, as well as working on coping skills, trust boundaries, processing relationship dynamics, and issues related to domestic violence; (3) continue to participate in intensive outpatient substance use treatment targeting relapse prevention and promoting healthy alternatives; (4) participate in evidence-based parenting classes focusing on expectations of children, empathy for children's needs, alternatives to corporal punishment, appropriate parent-child roles, and attachment issues; (5) based upon evidence Mother suffered a significant head injury, Mother should undergo a neuropsychological assessment to identify impairments with memory and cognition, and receive follow-up medical care for headaches which impacted her coping and wellbeing; (6) continue to seek supports in gaining secure and stable residence and maintain stable employment; and (7) seek connections with individuals and organizations that provide a support network and healthy recreational leisure activities and alternatives to substance use. (N.T. 8/25/22 at 55-57)

Dr. Smith agreed that Mother's failure to address her underlying drug and alcohol concerns with intensive outpatient therapy, in conjunction with her mental health issues, would significantly interfere with her ability to parent the Children. (N.T. 8/25/22 at 5) He was concerned that she was still using marijuana as recently as March 2022 and that she used

illegal substances to cope with past trauma. (N.T. 8/25/22 at 57-58) He agreed that Mother's inability or decision to not follow through with the recommendations to engage in outpatient mental health treatment and/or to abstain from drug or alcohol use, would impact her ability to effectively parent and assure the safety of the Children. (N.T. 8/25/22 at 59) Dr. Smith also testified that his recommendation that Mother complete an evidence-based parenting program was necessary because she had a number of medium or high risk areas concerning her parenting practices and stressors. (N.T. 8/25/22 at 58)

Mother's Dauphin County probation officer, Tyler Rolshausen, testified that he has been supervising Mother since she was sentenced on August 12, 2021, following her conviction for endangering the welfare of children. (N.T. 8/25/22 at 34-35) Rolshausen, who testified at the second hearing, stated that the day before that hearing, Mother was detained by police for violation of her probation conditions and for new charges of felony aggravated assault and conspiracy to commit aggravated assault. (N.T. 8/25/22 at 36) Rolshausen was told by a law enforcement officer involved that the new charges arose from an altercation resulting in facial fractures to the victim. (N.T. 8/25/22 at 37) As of the date of the second TPR hearing, Mother's probation revocation hearing date had not yet been scheduled and she remained in prison. (N.T. 8/25/22 at 37) Prior to that incident, Rolshausen stated that Mother had been generally cooperative with him and reported as required. (N.T. 8/25/22 at 37)

Rolshausen also testified that while under his supervision, he found marijuana and paraphernalia at her home on March 22, 2022. (N.T. 8/25/22 at 39) In lieu of new charges, Mother agreed to undergo drug treatment at GEO Group as another probation condition and Mother generally attended and complied with that program. (N.T. 8/25/22 at 39) Under her probation conditions, Mother was required to have a job but she generally failed to maintain consistent employment, primarily working on and off as a housekeeper. (N.T. 8/25/22 at 41) While under Rolshausen's supervision, Mother lived at a Harrisburg address with numerous people who came and went; Rolshausen believed that those living with Mother were a negative influence. (N.T. 8/25/22 at 44) Rolshausen stated that he would not allow children in Mother's home, noting it was typically filled with synthetic marijuana smoke. (N.T. 8/25/22 45)

23

Foster mother (resource parent) J.Z. testified that the Children are doing well living with her and her husband E.P.F., and their dogs and cats. The oldest child J.E.H.J. began first grade in Fall 2022, loves Batman, basketball, burritos and tater tots. One of the family cats is particularly fond of him. He is doing well after his kidney surgeries. He has a learning disability and has been afforded special education services from his school and sees a child psychologist. Foster mother testified that she helps him with his speech therapy, flash cards and imaginative play. He calls her "Miss J____," and comes to her when he is upset. He enjoys being with E.P.F., whom he calls by his first name or as "husband," which is an inside family joke. They enjoy watching super-hero movies together. According to J.Z., J.E.H.J. is exhibiting no significant behavioral issues. (N.T. 7/26/22 6-10)

Foster mother testified that the middle child C.R.J. began full time Kindergarten in Fall 2022. She attends regular talk therapy. She has no specialized needs otherwise. She enjoys coloring, painting and watching *Full House*. She comes to J.Z. when she needs something or is upset. According to J.Z., she has a good relationship with foster father. (N.T. 7/26/22 at 10-11)

The youngest child S.L.J.V. began attending full time pre-Kindergarten this Fall. She attends some early intervention programs and is on a wait list for an evaluation for developmental delay. Foster mother has tried to help with some of the child's speech issues using interactive electronic flash cards. (N.T. 7/26/22 at 12-13)

Foster mother and foster father share the daily tasks involving the Children including dressing them, putting the eldest on the bus, transporting them to and from school, making meals, bathing, putting them to bed and taking them to medical appointments. (N.T. 7/26/22 at 14) The Children look to both J.Z. and her husband for affection. (N.T. 7/26/22 at 19) J.Z. stated that she disciplines the Children primarily by having them take deep breathing breaks, which has been largely effective. (N.T. 7/26/22 at 13)

As of the July 2022 hearing, Mother was still participating in remote visits with the Children two times per week plus one in person visit every two weeks at ChildFirst. Mother had been fairly consistent with her attendance. During the remote visits, the Children are often not engaged in the visit and never ask to speak with Mother between visits. (N.T. 7/26/22 at 18-19, 20) Foster mother expressed some concerns with the in person visits, including anxiety by the Children in anticipation. In addition, the oldest child is relieved when the visits are over. Foster

24

mother testified that the Children used to cry a lot after the visits but that has improved over time. (N.T. 7/26/22 at 16) J.Z. testified that while Mother has a right to attend the Children's appointments, she has not done so. (N.T. 7/26/22 at 17) In addition, the Children also have remote visits with other family members including their maternal aunt and uncle, paternal grandmother, and a half-brother. (N.T. 7/26/22 at 19-20)

Mother presented one witness, Marcia Mitchell, a housing case coordinator with Help Ministries. She began meeting with Mother about every two weeks, starting in July 2021, to help her become financially stable and afford and maintain housing. (N.T. 8/25/22 at 108) She testified that Mother consistently attended meetings and was very cooperative. Mitchell also helped her personally discuss parenting issues though that is not an area of expertise. (N.T. 8/25/22 at 109) Help Ministries assisted Mother in obtaining her rental home in January 2022. Under their program, Help Ministries paid for the first three months of rent for Mother then offered reduced payment amounts for some period of time thereafter. (N.T. 8/25/22 at 113)

Finally, the guardian ad litem Jeffrey Clark represented to the Court at the end of the hearing that he has met with the Children at their foster parent home and that they appeared to be doing very well, seemed happy, and sought out affection from foster mother. He was in agreement with the Agency's position seeking termination of Mother's rights and of the goal change to adoption. (N.T. 8/25/22 at 118)

## Legal Discussion

In her statement of errors complained of on appeal, Mother raises a number of issues, distilled to the following: the Trial Court erred and/or abused its discretion by terminating Mother's parental rights (1) pursuant to 23 Pa.C.S.A. Sections 2511(a)(1) and (a)(2), where Mother presented evidence that she was able to provide essential parental care, control, and subsistence necessary for the child's physical and mental well-being because any conditions that lead to placement were remedied by Mother; (2) pursuant to 23 Pa.C.S.A. Section 2511(a)(5) and (a)(8), where Mother presented evidence that the conditions which led to the placement of the child no longer exist and (3) pursuant to 23 Pa.C.S.A. Section 2511(b), by failing to give primary

consideration to the developmental, physical and emotional needs and welfare of the child.

The standard of review governing the trial court's termination of parental rights is well settled:

> When reviewing an appeal from a decree terminating parental rights, [the appellate court] is limited to determining whether the decision of the trial court is supported by competent evidence. See In re K.C.W., 456 Pa. Super.1, 689 A.2d 294, 298 (1997). Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Id. Where a trial court has granted a petition to involuntarily terminate parental rights, [the court] must accord the hearing judge's decision the same weight we would give to a jury verdict. See In re Child M., 452 Pa. Super. 230; 681 A.2d 793, 800 (1996). We must employ a broad comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence. See, In re Matsock, 416 Pa.Super. 520, 611 A.2d 737, 742 (1992).

In re C. S. 761 A.2d 1197, 1199 (Pa. Super. 2000).

The Agency, as the party seeking termination, bears the burden of establishing, by clear and convincing evidence that grounds exist for termination of parental rights. In re J.D.W.M., 810 A.2d 688, 690 (Pa. Super. 2002). The standard of clear and convincing evidence means "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue." Matter of Sylvester, 555 A.2d 1202, 1203-1204 (Pa. 1989).

The record established by clear and convincing evidence that for an unreasonable time, Mother failed to remedy the conditions that led to placement despite the services and opportunities readily made available to her. The Court found termination of Mother's parental rights was thus warranted based upon Adoption Act Sections §2511(a)(1), (a)(2), (a)(5) and (a)(8), which provide:

> **(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

26

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a)(1), (2), (5) and (8). In deciding termination, the Agency need prove only one of these provisions to support the termination of parental rights. In re J.E., 745 A.2d 1250 (Pa. Super. 2000); see also, In re J.I.R., 808 A.2d 934, 940 n.6 (Pa. Super. 2002).

In considering whether the party seeking termination has satisfied these provisions, the Court considers that a parent has an affirmative duty to work towards the return of his or her children. In re Adoption of J.J., 515 A.2d 883, 889 (Pa. 1986). At a minimum, that "affirmative duty requires that the parent show a willingness to cooperate with [the Agency] to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood." Id. In a termination proceeding, the trial court must consider all the circumstances in determining whether a parent has fulfilled her obligations; the court must further measure the parent's performance in light of what would be expected of any individual under similar circumstances. Matter of M.L.W., 452 A.2d 1021, 1023-24 (Pa. 1982) (citations omitted). The Superior Court has explained:

27

The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state may properly be considered unfit and have her parental rights terminated. There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

\*\*\*

A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

In re K.Z.S., 946 A.2d 753, 759 (Pa. Super. 2008).

The Agency presented clear and convincing evidence to establish grounds for termination under Sections 2511(a)(1), (2), (5) and (8). Since shortly after the Child's placement in January 2020, Mother has failed to comply with almost every service objective critical to her ability to properly parent the Children, although ample resources and opportunities were extended to her; she has failed to meet her parental obligations via affirmative performance.

The evidence established under (a)(1) that the "the parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." Most notably, for a period of more than twenty-six months (26) months – between the date of the Children's removal from the motel in which they were living with Mother on January 7, 2020 and the filing of the TPR petitions on March 31, 2022 – Mother failed to perform almost all parental duties.

Notably, Mother was provided with resources which would have eventually allowed her to increase contact with the Children had she utilized them. For example, she failed to complete an evidence-based parenting program, as required by the Agency, which was specifically designed to address Mother's parenting deficiencies identified by Dr. Smith. She further failed, during the course of the Children's placement, to adequately obtain substance abuse treatment, address her

mental health problems and obtain steady employment. In addition, for much of the period of the Children's placement, she failed to obtain stable housing, and even after she did find a home, the credible evidence that she was using drugs therein and was allowing people to stay there who were negative influences. Furthermore, Mother failed to participate in an Agency-approved domestic violence therapy program which was necessary to remediate her history of living with abusive partners. The evidence reflected Mother's overall compliance with Agency objectives remained either minimal or non-compliant through the life of these cases. As noted above, "[a] parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." In re K.Z.S, supra.

Over the course of the Children's placement, Mother did attend supervised visits with them, sometimes once per week and at other times once every two weeks. Even then, the evidence showed that many of these visits went poorly whereby Mother showed up late, failed to bring prepared meals as agreed to and was unable to manage the Children and regulate their behavior. In addition, on numerous occasions, she was unavailable when needed including providing authorizations for the oldest child's two emergency surgeries and the youngest child's early intervention services for abuse.

The evidence also established under (a)(2) that the Children have been "without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." As noted above, since January 7, 2020, the Children have been without essential parental care, control or subsistence necessary for her physical or mental well-being. Furthermore, the record reflects that the failure of essential parental care has been primarily caused by Mother's lack of adequate treatment for her substance abuse and mental health issues, which have not been remedied by Mother to date and which this Court believes she would be unable to remedy in the future. Despite being provided many resources and encouraged and/or directed to comply by the Agency and the Court, Mother has failed to address these significant impediments, as outlined above. As noted, at a minimum, the "affirmative duty requires that the parent show a willingness to cooperate with [the Agency] to obtain the rehabilitative services necessary to enable the parent to meet the duties and obligations inherent in parenthood." In re Adoption of J.J. supra.

29

Based upon this record, this Court strongly rejects Mother's argument on appeal that under Sections (a)(1) and (a)(2) that she "presented evidence that she was able to provide essential parental care, control, and subsistence necessary for the child's physical and mental well-being because any conditions that lead to placement were remedied by Mother." Instead, almost no evidence supports Mother's claim that she has remedied any of the conditions that led to removal and placement of the Children. Instead, the record reflects that Mother has accomplished next to nothing between January 7, 2020 and the TPR hearing dates which showed that she remedied her problems, most notably, her history of substance abuse and mental health issues, parenting deficiencies and lack of steady employment. Furthermore, Mother had been arrested for potential felony criminal activity the day before the second hearing held on August 25, 2022, and was imprisoned as a result.

The evidence also established grounds for termination under (a)(5) that "the conditions which led to the ... placement of the child [for period of at least six months] continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would serve the needs and welfare of the child." The main conditions which led to placement were Mother's substance abuse history, lack of treatment, mental health issues, lack of adequate housing and employment and propensity to remain in abusive relationships. As is set forth above, she was provided services and assistance to help her address those problems, yet even so, these issues have not been remedied within a reasonable period of time.

For the same reasons, the Agency sufficiently established grounds for termination under (a)(8); i.e. that "the conditions which led to the ... placement of the child [for period of at least 12 months] continue to exist, and termination of the parental rights would serve the needs and welfare of the child." 23 Pa.C.S.A. § 2511(a)(8).

As this Court noted on the record at the end of the hearing:

> Initially the Court does applaud Ms. Jones for pursuing some forms of treatment, however, this is not a situation where she gets to pick and choose who her treatment providers are. Help Ministries is a great organization. They've provided you great support. The Court's concerned with what happens when they're not there. Initially,

while the GEO Group was a condition imposed by probation, it's not a substitute for Nasr [drug and alcohol treatment].

There's clear and convincing evidence that neither parent has followed through with their service objectives. Specifically, mother has not followed through with the treatment recommendations of Nasr, Mr. Smith, or anybody else with regard to mental health or drugs and alcohol, has not complied with her service objectives and has not even complied with her conditions of probation.

. . .

The Court finds specifically that granting this petition will not be injurious to the children and, in fact, severing the bond with the resource parents would, in fact, be injurious to them.

(N.T. 8/25/22 at 119-120)

As such, the Agency presented ample, clear and convincing evidence to establish grounds for termination under Sections 2511(a)(1), (2), (5) and (8).

Finally, Mother argues that the Court erred by determining that the best interests of the Children would be served by terminating her parental rights. Pursuant to Adoption Act Section 2511(b), a court must give "primary consideration to the [developmental, physical and emotional] needs and welfare of the child." In re J. E., 745 A.2d 1250, 1254-55 (Pa. Super. 2000) (citations omitted). The statute provides:

> Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the condition described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b).

This Court finds that the record strongly supports that the Children's developmental, physical and emotional needs and welfare are best served by termination of Mother's parental rights, as is set forth in great detail above.

Even were this Court to accept Mother's claims that she has made some progress, in relation to a child's need for permanency, the Superior Court stated,

31

We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that **a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parental responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future.** Indeed, we work under statutory and case law which contemplates only a short period of time, to wit eighteen months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

In re I.J., 972 A.2d 5, 13 (Pa. Super. 2009) (internal citations omitted; emphasis added). Termination of Mother's parental rights will provide the Children with the opportunity for permanency.

Our Superior Court has stated that, while "Section 2511(b) does not explicitly require a bonding analysis, [case law provides that] analysis of the emotional bond, if any, between a parent and a child is a factor to be considered in determining the developmental, physical and emotional needs and welfare of the child under §2511(b)." In the Matter of K.K.R.-S., K.M.R., K.A.R., 958 A.2d 529, 533 (Pa. Super. 2008).

In this case, a bonding analysis was in fact undertaken by Psychologist Fierras who presented comprehensive Bonding Assessments and testimony to the Court. The Bonding Assessments - analyzing the emotional bonds between each of the Children and their Mother, and each of the Children and the foster parents - established that with regard to Mother and the Children, their attachment or bonding levels were such that if severed, there would not be any "significant emotional injury to the Children." In fact, the evidence further reflected that a continuance of their relationship with Mother would be harmful to the Children, particularly with the oldest child. The deficient attachments Fierras found to exist between Mother and the Children stemmed from former traumas they suffered while in Mother's care.

On the other hand, Fierras presented credible evidence that the Children had established predominantly secure and positive attachments or bonding with their foster parents. To the extent the two younger children exhibited some aspects of insecure attachment with the foster parents, Fierras believed that this bond would improve the longer they remained with the foster parents. Notably, Fierras opined that the Children would be injured if their bonds with the foster parents

32

were severed.

Upon consideration of all of the evidence presented to this Court, including of the Bonding Assessments, this Court determined that it is in the Children's best interest that Mother's parental rights be terminated and that a goal change to adoption was entirely appropriate. Accordingly, this court issued its Decrees on August 25, 2022, terminating Mother's parental rights and directing the goal change, from which Mother has appealed.

<table>
<tr><td>December 12, 2022</td><td>John J. McNally, III, Judge</td></tr>
<tr><td>Date</td><td></td></tr>
</table>

Distribution:

Lisa Watson, Esq., P.O. Box 4061, Harrisburg, PA 17111 ........................ (for Mother on appeal)

David Natan, Esq., Dauphin County, 1001 N 6TH St, Harrisburg, PA 17102 (for Agency)

Jeffrey Clark, Esquire, 508 N. 2nd Street Harrisburg, PA 17101-1061 (Guardian ad Litem)

Kristen McCarthy, Dauphin County, 1001 N 6TH St, Harrisburg, PA 17102

L.M.J    151 Rolleston Street Harrisburg, PA 17104

L.M.J.   Dauphin County Prison #096992, 501 Mall Road, Harrisburg Pa. 17111-1299

M.V.     , 639 A Chestnut Street, Manchester, NH 03104

33